```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :    CRIMINAL ACTION
                              :
         v.                   :
                              :
SHAUN PETTIWAY                :    NO. 08-129
```

MEMORANDUM

McLaughlin, J.                                      September 3, 2009

        The defendant has been charged with making false statements in a United States passport application and aggravated identity theft. He moved to suppress physical evidence seized from a house and a car during the investigation. The government argues, among other things, that the defendant had no expectation of privacy in either the house or the car. The Court held an evidentiary hearing on the motion on August 24, 2009. The Court will deny the motion.

I.    Findings of Fact

        On June 5, 2006, the Pitman New Jersey Police Department obtained a warrant for the arrest of the defendant for an armed robbery of the Commercial Bank in Pitman, New Jersey, on April 17, 2006. On June 6, 2006, the Pitman Police Department requested assistance from the U.S. Marshal Service in executing the warrant. Deputy Marshal William Degan received the request and opened up an official case concerning the defendant. He obtained a fugitive warrant for the arrest of the defendant on

June 14, 2006.  Deputy Marshal Degan was in charge of the U.S. Marshal Task Force team responsible for serving fugitive warrants located in Camden, New Jersey.

Deputy Marshal Degan received information through the Gloucester County Prosecutor's Office that the defendant had tried to obtain a U.S. passport with his brother's information so he could flee the country.  When Deputy Marshal Degan received the information, he contacted Special Agent Alex Zuchman with the Department of State.  He asked Special Agent Zuchman to see if there was a passport issued in the name of either Shaheim or Shaun Pettiway.  Special Agent Zuchman called Deputy Marshal Degan back and told him that there had been a passport issued in the name of Shaheim Pettiway.  They compared photographs between Shaheim and Shaun to see whose photo was actually on the passport.  Independently and together they agreed that it was Shaun Pettiway's photograph.  He determined with Special Agent Zuchman that Shaun Pettiway had obtained a U.S. passport with his own photograph and his brother's biographical information on the passport.

Thereafter, on July 7, 2006, members of the Task Force went to 6623 Haddington Street to attempt to arrest the defendant.  Present were William Degan and Task Force Officers Scott McConnell, Tim O'Brien, Chris Leone, Jerome Scott, George Johnson, and Barry Johnson.  Before they went to that location,

Deputy Marshal Degan and Detective Johnson conducted a briefing for all the officers. They gave out assignments, described the location where they were going, and Deputy Marshal Degan informed the team about the defendant having obtained a passport.

The search was conducted at 6:00 a.m. Task Force officers surrounded the house. Detective Johnson, Marshal Degan and Chris Leone went up to the front door. They were dressed in tactical gear, wearing vests with visible markings of police. They all had guns and some people had their guns drawn. There was no shield used at the residence. Barry Johnson or Bill Degan knocked at the front door. A woman's voice asked who it was and they identified themselves. A woman opened the door. Detective Johnson asked her to identify herself and to tell them who lives at that residence. She said that she was Latifah Muhammad. They asked her if she knew Shaun Pettiway. She said that she did know him, but that he was not in the house. Detective Johnson asked Ms. Muhammad if it was alright to check to see if anybody else was in the house and she agreed. If Ms. Muhammad had not given the Task Force officers permission to enter the house, they would not have done so.

The officers searched the house but did not find the defendant. Detective Johnson stayed with Ms. Muhammad and questioned her about Shaun Pettiway. Initially, they were in the front room and then ended up in the kitchen area. Detective

Johnson told her that she could be charged with criminal charges. He let her know that if she did know anything about the defendant's whereabouts and was withholding information or lying, she could be charged with hindering. He briefly talked to the two children who were present in the house, trying to keep them calm. The officers did not verbally or physically confront or intimidate Ms. Muhammad. She was cooperative. She seemed to understand what was going on.

Detective Leone's role in the search was to clear the second floor. In the master bedroom, he noticed a pair of boots and some jeans laying on the floor next to the unmade bed. He also saw a package from the postal service with the defendant's brother's name on it. He thought that it might have been the passport package that was mentioned during the briefing, so he brought it down to Deputy Marshal Degan. He did that because Shaheim Pettiway was the name that he had been told was related to Shaun. He never looked inside the envelope. The envelope was unsealed when he took it to Deputy Marshal Degan.

Deputy Marshal Degan took the envelope and saw that the return address was "U.S. Government Services." He squeezed the envelope and felt an object in there that appeared to be the same size as what a passport would be. He opened the envelope and retrieved what turned out to be a U.S. passport in the name of Shaheim Pettiway with Shaun Pettiway's photo on it. There were

4

also inside the envelope two standard mailings that accompany a U.S. passport and a birth certificate in the name of Shaheim Pettiway.  Before he looked inside the envelope, Deputy Marshal Degan was positive that the passport was inside.

The Task Force had information that Ms. Muhammad was driving a black Nissan Maxima.  Deputy Marshal Degan found the car in front of the house at the end of the block at 67th & Haddington.  He saw on the rear seat of the car several passport application documents, and what looked like a money order receipt.  In the front on the driver's side floor was a Pennsylvania driver's license with a male's photo on it.  He went back to the residence and asked Ms. Muhammad for permission to search her car.  She said, "yes."  He said, "where are the keys?"  She said, "the keys are in my purse."  Deputy Marshal Degan got her purse in the living room, and handed it to her.  She handed him the keys.  Deputy Marshal Degan went down to the car and retrieved several items out of the car.  One item retrieved was the driver's license, which had Shaun Pettiway's name on it and the address of 5008 McKean Avenue.

Latifah Muhammad has owned a house at 6623 Haddington Street for six years.  Ms. Muhammad has a mortgage on the property and had one in 2006.  She lives there with her son.  In 2006, she lived there with her son and nephew.  Ms. Muhammad is thirty years old and graduated from high school in 1997.  She

attended college in 2002 and last year, began taking courses in accounting.  She currently works at TransUnion.  In 2006, she worked at NCO Financial and GMAC Bank.  She was a supervisor at NCO Financial at the time she left in June 2006 to go to GMAC where she was a customer service representative.

She met Shaun Pettiway at NCO Financial.  They worked in the same group.  She had a sexual relationship with him that started in April of 2006.  It was not a serious relationship.  They saw each other at work and then two to three times out of the week.  The relationship ended in the beginning of July of 2006.  From April to July, they saw each other at her house or at his grandmother's house.  At one time, she went to his apartment.  His apartment was in Germantown.  The defendant spent the night at her house one or two times a week.

When the defendant came to spend the night, he would bring some of his belongings for the night.  He might have left some small items behind like a t-shirt or socks.  He never stayed overnight more than one night in a row.  He did not have keys to her house.  He was not allowed to come and go as he pleased.  His name is not on the title.  His name is not on any of the bills.  He never helped her pay the maintenance of the house.  He never received mail at the house.  He lived in an apartment somewhere else.  When he was at her house, he was an invited guest.

In 2006, Ms. Muhammad leased a 2006 Nissan Maxima. When she and the defendant were dating, the defendant drove her car. When they were together, he generally drove. One or two times, he took her to work and picked her up after work in the car. The defendant did have a car – a Jaguar. She does not know what happened to his car. Mr. Pettiway's name is not on the title to the car. He never made any payments for it. He did not have keys to the car other than when she lent it to him. Each time he drove the car, he asked her permission and she gave it. At one point, she noticed that one key to her car was missing. She noticed it after the Marshals came to her house.

In July 2006 she was pregnant but does not know who the father was. She did not have the child. She did discuss being pregnant with the defendant. She never told him that he was the father. She was dating someone else at the time. The last time they went out together was July 4, when they went to a family barbeque. She saw the defendant and some of the defendant's family there. She argued with him that day about their relationship. She went home alone that night.

He came by the house one or two days later. He was dropped off. She was on the front porch. The children were outside playing. He had a bag in his hand. He went into the house. She did not tell him that he could go into the house. He just went in. She talked with him about the fact that their

relationship was over, and he should leave.  He did leave.  When she went upstairs that day, she noticed that the bag was still there and that there was an envelope on the dresser.  She thought the envelope was part of the defendant's belongings, not hers.  She did not open the envelope.  She did not give the defendant permission to leave his belongings.

II.  Analysis

The first question the Court must answer is whether the defendant had an expectation of privacy in either the house or the car that was searched.  The Court holds that the defendant did not have such an expectation in either the house or the car.  That decision does not end the matter, however, because the defendant may have not had an expectation of privacy in the house or the car but may have had an expectation of privacy in the envelope he left in the bedroom or in the items in the car.  Assuming that he did have an expectation of privacy in the items seized, the government properly seized them under the plain view doctrine.

In order to challenge a search based on a Fourth Amendment violation, the defendant must have had a legitimate expectation of privacy in the area searched and that expectation must have been reasonable.  Minnesota v. Carter, 525 U.S. 83, 91 (1998); Rakas v. Illinois, 439 U.S. 128, 143-44 (1978).  Short

term guests in a house do not have an expectation of privacy. United States v. Mosley, 454 F.3d 249, 259 (3d Cir. 2006). Overnight guests may have a legitimate expectation of privacy while they are in the home. Carter, 525 U.S. at 91; Minnesota v. Olson, 495 U.S. 91, 99 (1990); Mosley, 454 F.3d at 259. The privacy right ends when the overnight guest has departed. Carter, 525 U.S. at 90; Olson, 495 U.S. at 99.

A passenger in a car at the time of the search may have an expectation of privacy. Mosley, 454 F.3d at 253. The driver of a car must present "clear evidence of continuing possession and control" to have a privacy right. United States v. Baker, 221 F.3d 438, 443 (3d Cir. 2000) (emphasis added); United States v. Lopes, 2002 WL 29505*4 (E.D. Pa. 2002).

Mr. Pettiway did not have an expectation of privacy in the house. The house belongs to Ms. Muhammad. She paid the mortgage on the property and all expenses. His name was not on the title to the house or any bills for the house. The defendant was an overnight guest on several occasions from April to July. He was living somewhere else. Once the defendant left the house in July 2006, when Ms. Muhammad told the defendant to leave, he no longer had an expectancy of privacy in the house.

Nor did he have an expectation of privacy in the car. The car was leased by Ms. Muhammad. The defendant drove it sometimes but only with Ms. Muhammad's permission.

The defendant may have had an expectancy of privacy, however, in the envelope he left in the bedroom and the items in the car.  The Court will assume that he did.

Under the plain view doctrine, officers are permitted to seize property without a warrant where three requirements are satisfied: (1) the officer lawfully makes an "initial intrusion" or otherwise properly is in a position from which he can view a particular area; (2) the officer discovers incriminating evidence inadvertently, which is to say, he may not "know in advance the location of the [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext; and (3) it is "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.  Coolidge v. New Hampshire, 403 U.S. 443, 465-70 (1971).  "[I]f, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately."  Texas v. Brown, 460 U.S. 730, 739 (1983).  Requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property or incriminating evidence generally would be a "needless inconvenience."  Brown, 460 U.S. at 739; Coolidge, 403 U.S. at 468.

Detective Leone came upon the envelope inadvertently when he was looking for the defendant.  He had heard the report

on the fact that the defendant had applied for a passport in his brother's name.  It was "immediately apparent" that the envelope may be or contain evidence of a crime.  He gave it to Deputy Marshal Degan who felt the envelope and was sure it was a passport.

The same analysis applies to the items seized from the car.  They were in plain view from the outside of the car and it was "immediately apparent" that they were evidence of a crime.

An appropriate Order shall issue separately.